THE LELAND.

(*District Court, N. D. Illinois.* February 25, 1884.)

1. COLLISION—OBLIGATION OF UNITED STATES NAVIGATION LAWS.
    The obligation of the United States navigation laws, relative to the rate of speed allowed a steamer in order to prevent its colliding with other vessels in its path, does not become operative until the vessels are known to be about to meet. Nevertheless, *moderate* speed must *always* be used by steamers in a fog.

2. SAME—MODERATE SPEED.

The criterion of moderate speed is the condition of the steamer to be stopped immediately upon the apprehension of danger ahead.

3. SAME—EVIDENCE—BURDEN OF PROOF.

Proof that the party has violated the navigation laws, and been otherwise negligent, lays upon him the burden of proving that the damage did not result from such violation and neglect.

4. SAME—SCIENTIFIC THEORIES.

Scientific acoustic theories cannot be safely accepted generally in explanation of the failure of fog-horns to be heard.

5. SAME—MEASURE OF DAMAGE.

The originator of the damage whereby the vessel is exposed, more or less helpless, to destruction by the elements, is responsible for the entire damage done.

In Admiralty.

*H. W. Magee*, for libelant.

*Schuyler & Kremer*, for respondent.

*M. H. Beach*, of counsel, for respondent.

BLODGETT, J.. This is a libel by the owner of the schooner E. M. Portch to recover damages sustained by a collision between said schooner and the steam-barge Leland, on the waters of Lake Michigan, on the evening of March 26, 1882, the collision in question having occurred about 17 miles off the west shore of the lake, and nearly opposite a point midway between Manitowoc and Sheboygan. The Portch was running light, bound on a voyage from Chicago to Rowley bay for a cargo of railroad ties. The Leland was loaded with about 500 tons of pig-iron and some other freight, making a total cargo of about 550 tons, and bound on a voyage from Elk Rapids, Michigan, to Chicago. The libelant charges that this collision was caused wholly by the negligence of those in charge of the Leland; and the defense, on the part of the respondent, is that there was either contributory negligence on the part of those in charge of the schooner, or that the alleged negligence on the part of the Leland did not cause the collision. The collision in question, as near as it can be determined from the proof, occurred a few minutes before 8 o'clock in the evening; the wind was about south-east, a light sailing breeze of from four to five miles an hour, and the weather very thick and foggy; the course of the Portch was about N. by E., and that of the Leland S. by E. From a careful study of the proof I conclude that the Leland was running at the rate of at least eight miles an hour, and the Portch was making from four to five miles an hour, at the time the vessels sighted each other. It must be conceded, I think, from the proof, that neither of the crews of these two vessels was aware of the proximity of the other until they were about 300 feet apart, when they seem to have sighted each other about simultaneously. The proof on the part of the libelant all tends to show that the fog-horn was properly and continuously sounded on the schooner, "as required by the sailing rules, for more than two hours before the collision, and that her rate of speed was not dangerous."

The negligence on the part of the Leland, relied on by the libelant, is (1) that she had not a sufficient steam-whistle; (2) that her steam-whistle was located abaft the funnel, instead of before the funnel; (3) that said steam-whistle was not sounded as required by law, at intervals of not more than one minute; (4) that said steamer was running at too high a rate of speed; (5) that she had not a proper lookout.

It is admitted that the steam-whistle of the Leland was located abaft of the smoke-stack or funnel, and I am satisfied from the proof that this whistle was not as strong and effective as a steamer engaged in the navigation of the lake should carry for the purpose of giving sufficient warning to other vessels in the vicinity. It is true the law does not specify the dimensions or power of the steam-whistle to be carried by a steamer, but it is manifest that the whistle must be such as to give an effective warning to other craft in time, by the use of ordinary care and skillful seamanship, to avoid a collision.

Rule 15 of section 4233, Rev. St., reads as follows:

"Whenever there is a fog or thick weather by day or night, fog-signals shall be used as follows: (A) Steam-vessels under way shall sound a steam-whistle, placed before the funnel, not less than 8 feet from the deck, at intervals of not more than one minute. (B) Sail-vessels under way shall sound a fog-horn at intervals of not more than five minutes."

By a later regulation of the board of marine inspectors, approved by the secretary of the treasury, which gives this regulation the force of a statute, the intervals between the sounding of the fog-horn is reduced to two minutes. The proof on the part of the libelant tends to show that the whistle on the Leland was not sounded oftener than once in eight to ten minutes, and the proof on the part of the respondent does not show that it was sounded more frequently than at intervals of from three minutes to a minute and a half, so that the proof, even on the part of the respondent, shows a disregard of this rule as to the frequency with which the whistle was sounded, as well as of the location of the whistle. Rule 21 provides that "every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam-vessel shall, when in a fog, go at a moderate speed." The obligation imposed by this rule, to slacken speed, or, if necessary, stop and reverse when a steamer is approaching another vessel so as to involve risk of collision, does not, of course, become operative until those in charge of the steamer know that they are approaching another vessel; but the duty of a steam-vessel, when in a fog, to go at a moderate speed is one constantly resting upon her under such circumstances; and it is an undoubted violation of the sailing rules for a steamer to run at a reckless or dangerous rate of speed in a fog. What is a moderate, and what is a dangerous, rate of speed, are, of course, to some extent, comparative terms, depending upon surrounding circumstances. The testimony of the various witnesses in this

case as to the speed of the steamer, at the time she sighted the schooner, varies from seven miles an hour, which is the lowest estimate of respondent's witnesses, to eleven miles an hour, which is the highest estimate of libelant's witnesses. I conclude, however, from the proof that the speed of the steamer was at least eight miles per hour, and may have been eight and a half, at the time the schooner was sighted by those on board the steamer; and this rate of speed, I have no doubt, was too great in a dense fog, in the night-time, upon waters where the liability to collision was so imminent as on the waters of Lake Michigan, even at this early season of the year; as this collision occurred upon one of the great thoroughfares of the lake, where vessels engaged in the lumber trade between ports on this lake are almost constantly passing at all times when navigation is open.

The case of *The Pennsylvania,* 19 Wall. 133, is instructive upon this question. The court, by Mr. Justice STRONG, says:

"The two vessels were not more than two or three hundred feet apart, and the steamer had the bark almost across her bow, yet it is possible that if her helm had been put to starboard, instead of port, when the lookout announced 'bell on the starboard bow,' and had been kept starboarded, the collision might either have been avoided or have been much less disastrous. * * * But if this is not to be attributed to her as a fault, there is no excuse to be found in the evidence for the high rate of speed at which she was sailing during so dense a fog as prevailed when the vessels came together. The concurrent testimony of witnesses is that objects could not be seen at any considerable distance, probably not further than the length of the steamer, and yet she was sailing at the rate of at least seven knots an hour, thus precipitating herself into a position where avoidance of a collision with the bark was difficult, if not impossible, and would have been even if the bark had been stationary, and she ought to have apprehended danger of meeting or overtaking vessels in her path. She was only 200 miles from Sandy Hook, in the track of outward and inward bound vessels, and where their presence might reasonably have been expected. It was therefore her duty to exercise the utmost caution. Our rules of navigation, as well as the British rules, require every steam-ship, when in a fog, 'to go at a moderate rate of speed.' What is such speed may not be precisely definable. It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the requirement being to guard against danger of collisions, very plainly the speed should be reduced as the danger of meeting vessels is increased. In the case of *The Europa,* Jenk. Rule Road, 52, it was said by the privy council, 'This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has a right to navigate at such a rate that it is impossible for her to prevent damage, taking all precaution at the moment she sees danger to be possible, and if she cannot do that without going less than five knots an hour, then she is bound to go at less than five knots an hour.'"

So, in the case of *The Colorado,* 91 U. S. 692, the supreme court, speaking by Mr. Justice CLIFFORD, said:

"Lights and other signals are required by law, and sailing rules are prescribed to prevent collision, and to save life and property at sea, and all experience shows that the observance of such regulations and requirements is never more necessary than in a dense fog, whether in the harbor or in the open ocean, if the vessel is in the common pathway of commerce.

"Mariners dread a fog much more than high winds or rough seas. Nautical skill, if a ship is seaworthy, will usually enable the navigator to overcome the dangers of the winds and the waves, but the darkness of the night, if the fog is dense, brings with it extreme danger which the navigator knows may defy every precaution within the power of the highest nautical skill. Signal lights in such an emergency are valuable, but they may not be seen; bells and fog-horns, if constantly rung or blown, may be more effectual, but they may not be heard. Low speed is indispensable, but it will not entirely remove the danger, nor will all these precautions in every case have that effect. Perfect security, under such circumstances, is impossible."

In the case of *The Manistee*, 7 Biss. 35, the learned circuit judge of this circuit found from the proof that the rate of speed of the steamer was seven miles per hour, and said:

"Now, without laying down any absolute rule as to speed at which a steamer should run in a fog on these lakes, there can be no question but that when a steamer is running in the fog, surrounded by sail-vessels, as this steamer knew that she was, and in close proximity, that to run at the rate of speed that this propeller was running was a gross wrong—a great risk which she had no right to incur—to the sailing vessels that were near. I know what steam-boat men say, that they must make their time; that they must run in the fog. But they cannot be permitted to run with their usual speed in a fog, surrounded by sail-vessels, against which they are liable to collide at any moment."

The proof as to the want of a sufficient lookout is substantially this: The collision occurred during the captain's watch. There was no second mate to assist the captain. The only persons on deck were the wheelsman inside the pilot-house, the captain who was attending to the sounding of the fog-whistle signals, and a night-watchman by the name of Cook who was doing the duty of lookout and also had charge of the lights and such other duties as devolve upon a night-watchman on board of a steamer. A few minutes before the collision this watchman had been below to call the watch, which was changed at 8 o'clock. And although both he and the captain concur in the statement that he was standing near the captain by the pilot-house just at the moment of collision, yet from the disclosures in the testimony he could have been there but a few moments prior to the time the schooner was sighted; the testimony on the part of the schooner showing that her fog-signals were sounded regularly and continuously, as required by law, it is possible, if not probable, that if Cook or any other competent lookout had been stationed in the proper location upon the steamer, charged with the single duty of looking out for other vessels and listening for fog-signals, he might have heard the fog-horn from the deck of the schooner; and I conclude, therefore, that this steamer at the time of this collision had not a competent lookout, such as the ordinary rules of prudent navigation require. A vigilant lookout, whose sole business it is to look out for other vessels and listen for fog-signals, is deemed absolutely necessary on any vessel running in the night-time, but all the more necessary in a fog.

In *St. John* v. *Paine*, 10 How. 585, the court said:

"A competent and vigilant lookout, stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steam-boat from blame in case of accident in the night-time, while navigating waters on which it is accustomed to meet other crafts."

In *The Genesee Chief* v. *Fitzhugh*, 12 How. 447, it is said:

"It is the duty of every steam-boat traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout besides the helmsman. It is impossible for him to steer the vessel and keep the proper watch in his wheel-house. His position is unfavorable to it, and he cannot safely leave the wheel to give notice when it becomes necessary to check suddenly the speed of the boat. And whenever a collision happens with a sailing vessel, and it appears that there was no other lookout on board the steam-boat but the helmsman, or that such lookout was not stationed in a proper place, or not actively and vigilantly employed in his duty, it must be regarded as *prima facie* evidence that it was occasioned by her fault."

In *Chamberlain* v. *Ward*, 21 How. 570, Mr. Justice CLIFFORD says:

"Steamers navigating in the thoroughfares of commerce must have constant and vigilant lookout stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of the duty to which they are assigned. To constitute a compliance with the requirements of law, they must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of that duty, and, for a failure in either of these particulars, the vessel and her owners are responsible."

In *The Colorado*, 91 U. S. 699, the same judge said:

"Lookouts are valueless unless they are properly stationed and vigilantly employed in the performance of their duty; and if they are not, and in consequence of their neglect the approaching vessel is not seen in season to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable, unless the other vessel was guilty of violating the rules of navigation." *Baker* v. *City of N. Y.* 1 Cliff. 84; *Whitridge* v. *Dill*, 23 How. 453; *The Catharine*, 17 How. 177.

But it is contended by respondent that, although these acts of neglect may be established by the proof, still the proof fails to show that the collision was occasioned by any one, or all combined, of these violations of the sailing rules or acts of negligence; and it is insisted that the collision in question was an inevitable accident; that the fact that the fog-horn was properly blown on the schooner and the whistles sounded on the steamer at intervals of from one and a half to three minutes, and that these signals were not heard on the other vessel, is proof that the condition of the atmosphere was such that sounds were not transmitted in the usual and ordinary manner, and that hence neither was notified of the proximity of the other vessel; and the well-established rule is invoked by the respondents, that the mere violation of sailing rules, or an act of negligence, is not of itself proof to sustain a claim for damages, or make the party guilty of these acts of negligence liable for damages, unless it appears that the damage or injury was occasioned by reason of such acts of negligence or vio-

lation of the sailing rules. It is also contended by respondents that the schooner was at fault because her lights were placed in the mizzen instead of her fore rigging, thus placing the lights further aft, and thereby diminishing, by the distance between the fore and mizzen rigging, the distance forward at which the lights could be seen; but as the proof shows that the upper sails of the schooner were seen before her lights were discovered on the steamer, owing to the fact that the fog was more dense near the water, I cannot believe that the location of the lights had anything to do with the collision. I think the more correct statement of the point involved in this branch of the case would be to say that where a party sought to be charged with the damage is shown to have been guilty of palpable negligence in seamanship, or to have violated the statutory rules of navigation, such parties should be held responsible, unless it is shown that the damage complained of was not the result of such negligence or violation of the rules of navigation. In other words, proof of violation of the fixed statutory rules of navigation, and of other acts of negligence by the party causing the damage complained of, casts upon such party the burden of proof that such damage was not occasioned by this neglect.

In the case of *The Morning Light*, 2 Wall. 550, Mr. Justice CLIFFORD says:

"Different definitions are given of what is called an inevitable accident on account of the different circumstances attending the collision to which the rule is to be applied. Such disasters sometimes occur when the respective vessels are each seen by the other. Under those circumstances it is correct to say that inevitable accident, as applied to such a case, must be understood to mean a collision which occurs when both parties have endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident. When applied to a collision occasioned by the darkness of the night, perhaps a more general definition is allowed. 'Inevitable accident,' says Dr. LUSHINGTON, in the case of *The Europa*, 2 Eng. Law & Eq. 559, 'must be considered as a relative term, and must be construed not absolutely, but reasonably, with regard to the circumstances of each particular case; viewed in that light, inevitable accident may be regarded as an occurrence which the party charged with the collision could not possibly have prevented by the exercise of ordinary care, caution, and maritime skill."

So in the case of *The Grace Girdler*, 7 Wall. 196, the supreme court said:

"While fault is shown on the part of the damaging vessel, it is incumbent on her to show that such fault had in no degree the relation of cause and effect to the accident."

And in reference to the point that these fog-signals were unavailing on account of the peculiar condition of the atmosphere, I can only say that the researches and experiments of scientists, as detailed in later works on acoustics, as well as the common experience of the unlearned, seem to show that the capacity of the atmosphere to transmit sounds is not only much less at some times than others, but at times there is a condition of nearly or quite "acoustic opacity."

Tynd. Sound, Pref. to 3d Ed.; also chapter 7 of same edition.    But
unfortunately we seem to have as yet no test, except actual experi-
ment at the time, to show or prove when such conditions exist.    The
"acoustic cloud," as it is called, is not visible to the eye or palpable
to the touch.    It, as observation would seem to show, may exist only
momentarily, and even some sounds may be transmitted and others
not.    It can hardly be safe, therefore, to accept this assumed scien-
tific theory as a defense upon the mere proof that sound-signals
were not heard, at least until the party invoking this defense shows
that he has fully complied with all the requirements and conditions of
the law in regard to the giving of his signals and the appliances by
which they are to be made.    It will not do to accept the defense that
the atmosphere was acoustically opaque without something more
than the proof in this case.    The effect of accepting such a defense
on such proof would be to hold that in all cases where signals are not
heard in a fog, it was attributable to the atmosphere, and not to the
negligence of the parties charged by the law with the duty of giving
such signals by means of certain instrumentalities, and at certain in-
tervals.

I do not find anything in the record in this case which would justify
me in presuming that this condition of the atmosphere existed on the
night in question.    It was a foggy night; the fog was thick and dense;
no high wind was blowing and nothing unusual or out of the ordi-
nary appearance of foggy nights was noticed or observed by any of
the witnesses in the case.    The mere fact, standing by itself, that the
crew on one of these vessels did not hear the signals upon the other
before the vessels sighted each other, is not, I think, sufficient to sus-
tain the assumed scientific theory invoked by respondents.    We must
remember these vessels were approaching a common point where
their courses intersected at a very oblique angle, and at the rate of at
least 12 miles an hour.    Assuming, as I think we are justified in do-
ing, from the evidence, that the whistle was not sounded oftener than
once in three minutes, the two vessels might have been 2,100 feet, or
two-fifths of a mile, apart at the time the last blast was given from
the whistle of the steamer prior to the collision; and from the proof
in regard to the distance at which it could be heard on the night in
question, it is extremely doubtful whether the sound from the whistle
would have penetrated this dense fog in face of whatever breeze was
blowing, to a distance of one-third of a mile on the night in question,
without assuming that a phenomenal atmospheric condition prevail-
ing at the time prevented these signals from being heard.    The fog-
horn on the schooner probably could not have been heard over 300
to 500 feet; and with the vessels approaching a common point at the
velocity shown by the proof, the last blast from the fog-horn might
have been properly blown and yet not have been heard on the steamer
before the vessels were in sight of each other and in peril of collis-
ion.

It is urged that if the schooner had heard the whistle of the steamer she could have only done precisely what she did do, and that is, keep her course; and that as the two vessels were approaching each other upon courses which would bring them together, the collision might have occurred, although the schooner did hear the fog-signals on the steamer. The answer to this is that if the schooner had heard the fog-signals on the steamer they might have displayed a torch or flash-light, which would have penetrated the fog a greater distance, and given the steamer notice of the proximity of the schooner; and it is also worthy of suggestion that, if the schooner had heard the fog-signal on the steamer, and the steamer, by reason of the density of the fog, or from any other reason, had not heard the signal from the schooner, the schooner would have been bound by rule 24 to have done all she could to avoid the immediate danger, which she could readily have done, as soon as the locality of the steamer was determined, by sounds from her fog-signals. So, also, if the steamer had been going at a moderate rate of speed, say four to five miles an hour, she would not have crossed the course of the schooner in time to have brought the two vessels together. It required just the speed at which the steamer was running, combined with the course and speed of the schooner, to bring about a collision between the two vessels at the point where their courses crossed, and if the steamer had been going slower, the collision would not have occurred; but the main reason in my mind for insisting that the speed was too great in this case, is the fact, disclosed in the proof, that when the master of the steamer sighted the schooner, when the two vessels were about 300 feet apart, he at once ordered his helm hard a-port, stopped and reversed his engine, and backed, and yet he was so near to the schooner that this maneuver was ineffectual, and this collision occurred.

The rule, as intimated in the authorities I have cited, would indicate that the standard or criterion of speed at which a steamer can safely proceed in a dense fog, upon a highway of commerce like this, and when the peril of collision is ever present, is only such speed as will enable her to stop, so as to avoid a collision after she sights or hears the signals of a sail-vessel crossing her path. If the condition of the atmosphere is such that approaching vessels can be seen or heard half a mile away, a steamer may run at a rate of speed which will enable her to stop or change her course in a half mile, but if it is so thick or dark that other vessels cannot be seen over 200 feet, then, the steamer's speed must be proportionally slower, so that she can stop or safely change her course so as to avoid the collision after she discovers the sail-vessel. We find then that this steamer directly violated the rules of navigation by locating her whistle abaft her smoke-stack. It must be presumed that congress in expressly enacting that the steam-whistle must be placed before the funnel, did so because the funnel would intercept or break the waves of sound from the whistle and prevent their being projected or sent forward

in the pathway of the steamer, as they should be, in order to prove effective as fog-signals. We find, further, that these fog-signals were not sounded with such frequency as the statute expressly requires. We find, also, that there was no such efficient lookout on the deck of this steamer as common prudence required; and these faults, being clearly brought home to the steamer, I think she must be held responsible as the direct cause of the collision.

But it is further urged that the loss of this schooner was not the direct and necessary consequence of this collision. The proof upon this branch of the case shows that the schooner was struck upon her port bow, and her entire bow broken in down to the water-line. She did not take in water very rapidly at first, however, and the steamer took her in tow and headed, for a time, towards Manitowoc, as by running in that direction away from the wind she did not encounter the waves so heavily but that her pumps could keep her clear. After a time the wind changed somewhat, and her course was shifted, and the schooner was towed nearly opposite the entrance of Sheboygan harbor, where she was let go at about half-past 4 o'clock in the morning after the collision. Attempts were made, by the master and crew of the steamer, to get her towed into the harbor, and the assistance of some light tugs, employed in the fishing business at Sheboygan, was obtained, they being the only tugs available for the purpose there; but by the time the tugs got hold of her, so much water had been taken in that she had sunk so deep as to prevent her being taken over the bar and inside the harbor. The wind shortly afterwards increased in violence, and the result was the vessel was driven on shore, sunk, and broken up. It is contended, from these facts, that the destruction of the vessel was in consequence of the storm which came up after the steamer had towed her to the mouth of Sheboygan harbor, and that the injury from the collision was not the direct and proximate cause of the loss of the schooner. But it seems to me the proper way of looking at the matter is to inquire what would have been the probable effect of this blow upon the vessel if she had been left out in the lake, 17 miles from land, where the collision took place. Would she have probably survived this injury, and could she, by proper seamanship and care, have been taken into a place of safety? With her bows broken open, as is shown by the proof in this case, I can hardly imagine that this vessel could have been safely navigated by herself to a port of safety, and I can only consider her final disaster as occurring in spite of all that was done by the steamer and the crew of the schooner to save her. In my estimation, from the proof, she would have sunk if left out in the lake where the collision occurred. She only sunk and went to pieces upon the shore after she was towed to the mouth of the harbor. What was done to save her was unavailing. If nothing had been done, the same result would have, perhaps more speedily, followed, and she would have more readily waterlogged out in the lake, and either sunk or

drifted upon the shore, and finally fallen a helpless victim of the same gale which drove her ashore and wrought her final destruction; but the helpless condition which made her the victim of this gale was the injury received in the collision. I therefore come to the conclusion that the loss of the Portch is fairly and properly chargeable to the acts of the Leland, and that she should be held responsible therefor.

There is a large amount of testimony in the record in regard to the value of the Portch, and as her loss was substantially total, only about $600 worth of wreckage having been saved from her, it becomes very material to inquire what was the value of the vessel at the time of the collision. Libelant claims not only the value of the vessel, but the value of the net amount of freight, which she would have earned on the voyage she was then prosecuting, together with nearly $6,000 which he expended in endeavoring to get her off after she had been driven on shore by the gale. In regard to the claim for freight and the cost of the unavailing efforts to save the vessel, I am clearly of the opinion that none of these items can be allowed, and that the true measure of damages is the value of the schooner at the time of the collision and interest from that time. *The Baltimore*, 8 Wall. 386; *The Falcon*, 19 Wall. 75; *Pajewski* v. *Canal Co.* 11 FED. REP. 313. The commissioner, from the proof before him, came to the conclusion that the value of the schooner was $16,800, and so finds by his report. I am of the opinion that this estimate is somewhat high, and that the more reliable proof in the case does not justify the finding of the value to have exceeded $15,000. It is true, there is a wide range of judgment among the various witnesses as to the value of the schooner at the time of the collision, but a large proportion of the libelant's testimony, in my estimation, gives a speculative value; and while the respondent's testimony seeks to limit the liability to what was considered by the insurance inspectors as her insurable value, I think the more reliable testimony is that of Oliver, Dunham, Holmes, and such witnesses, who were engaged in buying and selling vessels, and who offered to buy this vessel, and would have bought her if they could have got her for $15,000, but were not willing to pay more than that. I therefore conclude that her value was $15,000. The exceptions to the commissioner's report are therefore overruled in all respects, except that said report is modified by finding the value of the schooner to be $15,000 instead of $16,800. In reaching this conclusion as to the value of the schooner, I am not disposed to make any deduction for the value of the wreckage saved. The libelant expended a large sum of money, as I have no doubt, in good faith, in efforts to get the schooner off after she had gone ashore. This amount being disallowed, I do not think injustice will be done by allowing the benefit of this salvage to the libelant.

A decree will be entered finding the Leland at fault, and finding the libelant's damages to be $15,000, the value of the schooner, and interest thereon at 6 per cent. per annum from the twenty-sixth of March, 1882, when the collision occurred.