**CLEARY BROS., Inc., v. PORT READING R. CO.**

District Court, E. D. New York. January 27, 1928.

No. A-7941.

I. Towage ⟜11(10)—Master of tug fastening barges to flotilla attached to pier must see that boats are properly moored to meet both existing and anticipated conditions.

It was duty of master of tug, fastening barges to flotilla attached to pier, to see that barges were properly moored, not only to meet conditions actually existing, but those which might reasonably be anticipated.

2. Towage ⟜11(10)—Master fastening barges to flotilla tied to pier must ascertain whether lines of inner boats are sufficiently strong to stand added boats.

Master of tug, fastening barges to flotilla attached to pier, had duty of inspecting lines of inner boats to ascertain whether they were sufficiently strong to stand the added boats moored by him.

3. Towage ⟜11(10)—Master, fastening barges to flotilla, need not inspect cleats and fastenings on inner boats or mooring posts.

Master of tug, fastening barges to flotilla moored to pier, is not required to inspect or examine the cleats and their fastenings on the inner boats or the mooring posts.

4. Towage ⟜15(2)—Negligence of tug mooring barges to flotilla, which later went adrift, held not shown.

Libelants held not to have made out prima facie case of negligence on part of tug fastening barges to flotilla attached to pier, after which all of boats went adrift and were damaged; it not being shown what caused the boats to break away.

5. Towage ⟜11(10)—Tug's negligence in fastening barges to flotilla held not proximate cause of damage, where flotilla, after going adrift, was tied up by fireboat, and thereafter again broke away.

Tug, even if negligent in fastening barges to flotilla, which thereafter went adrift, was not liable for subsequent damage, where city fireboat, seeing flotilla adrift, tied it up before any damage was done, and flotilla thereafter again broke away and caused damage, since tug's negligence was not proximate cause of damage, there having been an intervening human agency.

In Admiralty. Consolidated libels by Cleary Bros., Inc., against the Port Reading Railroad Company. Decree dismissing each and all of libels.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for Cleary Bros., Inc.

William F. Purdy, of New York City, for various other libelants.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for Port Reading R. Co.

CAMPBELL, District Judge. There were ten causes of action consolidated under the above title, each brought to recover damages from the respondent because of substantially the following alleged fault: "That the respondent, its agents and servants in charge of the respondent's said steamtug, negligently and carelessly landed said coal barges alongside the said flotilla, and made or caused the said barges to be made fast to the said flotilla in a negligent, reckless, and careless manner, and added the aforesaid loaded barges to the flotilla, which was then

made fast, causing too great a strain and weight to be added to the lines, cleats, and fastenings of the barges, which were made fast between the barges so added and the pier, and negligently and carelessly failed to inspect the lines, cleats, and fastenings on the barges between those made fast by the respondent's said tug and the pier, as a result of all of which a great unusual and excessive strain was placed upon the cleats, lines, and fastenings of the barges between the boats so added by the respondent's tug and the pier, causing the fastenings, or some of the fastenings, from the aforesaid barges to break or give way and allowing" the boats specified in the several libels "to go adrift, together with a number of the other boats." In some of the libels it was alleged that the boats specified, "after going adrift, were carried by the tide through Hell Gate, striking the rocks and causing said barges to sink with their cargoes."

Cleary Bros., Inc., was the owner of the coal barges John J. Smith, Ulster, and E. F. Cleary. Sidford & Green, Inc., was the owner of the cargo laden on board the barge E. F. Cleary. James Stuart was the owner of the coal barge David Stuart. Pittsburg Fuel Company was the owner of the cargo laden on the barge Ulster. James M. Tucker was the owner of the coal boat Rose Marie. Steamship Fuel Corporation was the owner of the cargo laden on the boat David Stuart. Michael Farrell was the owner of the barge Willie Sheridan. Commercial Coal Company was the owner of the barge Silver Valley and bailee of her cargo. Stephens Fuel Company, Inc., was the owner of the cargo laden on the boat Willie Sheridan. Thomas Tucker was the owner of the boat W. N. Weeks.

Between 7 and 8 o'clock Sunday night, February 8, 1925, the coal boats Empire, Conrey, Green Island, and E. F. Cleary, loaded with coal, arrived at Ninety-Sixth street, East River, New York. There were there at that time two tiers of loaded coal boats moored to the north side of the pier at Ninety-Sixth street; the first boat of each tier being made fast alongside the pier, and each succeeding boat being made fast alongside the boat inside of it toward the pier.

At the time of the arrival of the four boats last mentioned, there were ten boats moored in the outer tier, in the order named, viz.: (1) Boat alongside the pier (name unknown); (2) Dwyer; (3) Palmer; (4) Ulster; (5) CCC; (6) Smith; (7) Weeks; (8) Silver Valley; (9) Irvington; and (10) Annie O'Boyle. To this tier was moored in the same manner the said four boats, in the following order: (11) Empire; (12) Conrey; (13) Green Island; and (14) E. F. Cleary.

Later that night the Port Reading tug Wyomissing came up with five boats and left three, which she moored across the ends of boats of the outer tier, each of the boats so moored having her ends up and down stream and being moored one alongside the other in the order named, viz.: Rose Marie, made fast across the ends of the boats of the outer tier, one part being made fast to the E. F. Cleary, and the other part to the O'Boyle, outside of the Rose Marie was the David Stuart, and outside of her was the Willie Sheridan.

The three boats thus made fast across the outside ends of the outer tier were in an exposed position, and in an effort to help the situation the captain of the Willie Sheridan, which was the outer boat and the most exposed, moved his boat in and at the end of the outer tier, and made his boat fast alongside of the E. F. Cleary, thus making 15 boats in the said outer tier and 2 boats across the outside ends of the boats in said outer tier.

Some time around 1:30 o'clock on Monday morning, February 9, 1925, the tide being ebb, the outer tier of boats swung around, out in the river, and down in the direction toward the bridge between Brooklyn and New York. A fireboat owned and operated by the city of New York then came and pushed the flotilla over to Mill Rock, where it was tied up. About 5 o'clock in the morning of that day the flotilla went adrift from Mill Rock and was carried by the tide, which had changed to flood, up through Hell Gate, where damages were inflicted on the boats and cargo described in the several libels.

[1] The placing by the Wyomissing of the three boats across the outside ends of the boats of the outer tier undoubtedly subjected that tier to a much greater strain, and notwithstanding the fact that many boats were generally tied up to the north side of the Ninety-Sixth street pier, it was the duty of the master of the tug to see that the boats were properly moored, and that meant, not only to meet conditions which actually existed, but those which might reasonably be anticipated.

The movement of the Sheridan, from the exposed position as the outer boat of the three made fast across the outer ends of the boats of the outer tier to the position of the fifteenth boat in the outer tier, to some extent reduced the strain and improved the position of that boat, and was advantageous

to the boats in the outer tier. That 14 or 15 boats, including the 3 last tied up there by the Wyomissing, went adrift, is beyond question of doubt; but no evidence was offered to show that any of the mooring lines parted, or what caused the boats to go adrift.

The libelants do not confine their allegation of the cause of the breaking adrift of the boats to the parting of lines, but to the strain put upon the cleats, lines, and fastenings of the barges between the boats added by the Wyomissing and the pier, causing the fastenings or some of the fastenings from the aforesaid barges to break or give way.

[2] There was imposed on the master of the Wyomissing the duty of inspecting the lines of the inner boats, to ascertain whether they were sufficiently strong to stand the added boats moored by him. The Brigham Bros. No. 4, 1925 A. M. C. 1112; O'Boyle v. Cornell Steamboat Co. (C. C. A.) 298 F. 95, 1924 A. M. C. 708; The Herbert S. Keller (D. C.) 19 F.(2d) 527.

[3] I am unable to find any case which imposes on the master of the tug the duty of inspecting or examining the cleats and their fastenings on the inner boats or the mooring posts. To require an inspection or examination by the master of the tug of the cleats, to ascertain whether they could sustain the strain, would, in this instance, have been impossible, as the boats were loaded and an inspection under their decks, which would have been necessary to determine the strength of their fastenings, could not have been made. [4] The accident may have been caused by the parting of the lines, the giving away of the cleats and fastenings of the inner boats, or even the manipulation of the lines. We do not know the cause, as it was not shown by any witness for libelants, and as the respondent might be liable if the breaking away was due to the parting of the lines, and would not be liable if it was due to the breaking of the cleats or their fastenings, or to manipulation of the lines. I cannot speculate as to the cause of the accident. Patton v. Texas & Pacific Rwy. Co., 179 U. S. 658, 663, 21 S. Ct. 275, 45 L. Ed. 361; Francey v. Rutland R. R. Co., 222 N. Y. 482, 119 N. E. 86.

[5] The libelants have failed to show negligence on the part of the respondent, and I do not see how the failure of the respondent to call witnesses to show what inspection or examination it made can be held to raise a presumption against it, in the face of the libelants' failure to make out a prima facie case. If, however, I am in error in so find-

ing, and it can be held that the libelants have made out a prima facie case of negligence on the part of the Wyomissing, because of failure to properly moor the boats, it does not seem to me that such failure was the proximate cause of the damage to the boats.

The boats were not being navigated but were moored at Ninety-Sixth street pier. They went adrift and before receiving any damage they were pushed over by the fireboat and made fast to the dock at Mill Rock. The witnesses from the fireboat were disinterested witnesses, and from their testimony it appears that the flotilla was properly moored at Mill Rock, but some hours later, after the tide had changed, the flotilla again went adrift, and serious damage was inflicted on the several boats in question. From the testimony I cannot say whether it was the parting of the lines, or what it was, that caused the flotilla to go adrift from Mill Rock.

Libelants cite, on the question of proximate cause, The Leland (D. C.) 19 F. 771, 780; The Baltimore Maru (C. C. A.) 11 F.(2d) 836; The Sylvia, 1924 A. M. C. 1222; The Santa Rita (C. C. A.) 176 F. 890, 895, 30 L. R. A. (N. S.) 1210; Muller v. Globe & Rutgers Fire Ins. Co. (C. C. A.) 246 F. 759, 763; Reicher v. Borwick, 1894, 2 Q. B. 548; Leyland Shipping Co., Limited, v. Norwich Union Fire Ins. Soc., Limited, 1918 A. C. 350—and in them it is held: "That cause is proximate which sets the other causes in motion; only when causes are independent is the nearest in time looked to." And also: "If there is an unbroken connection between act and injury, the act causes the injury; an intervening act is not the proximate cause of injury, unless it is efficient to break the casual connection." Muller v. Globe & Rutgers Fire Ins. Co. (C. C. A.) 246 F. 759, 763.

One of the most valuable tests to apply, to determine whether a negligent act is the proximate or remote cause of an injury, is to determine whether a responsible human agency has intervened between the fact accomplished and its alleged cause. "If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered too remote." The Santa Rita (C. C. A.) 176 F. 890, 895, 30 L. R. A. (N. S.) 1210. "The law is plain enough that the proximate cause is the dominant cause, and that, where there is an unbroken connection between the act complained of and the injury, it, and not an intervening act, is the proximate cause." The Baltimore Maru (C. C. A.) 11 F.(2d) 836, 837.

Even if the Wyomissing he held at fault

for the going adrift of the flotilla from Ninety-Sixth street, a responsible human agency, in the persons of the firemen from the fireboat and the captains of such of the boats of the flotilla as put out lines, intervened between the going adrift of the flotilla from Ninety-Sixth street and from Mill Rock several hours after the flotilla had been tied up there.

The cases cited by the libelants, supra, are mainly of boats injured by collision or torpedoed, which thereafter sank, and it seems to me they are clearly distinguishable from the case at bar. The boat that is injured in a collision or torpedoed, and is caused thereby to leak, does so solely because of such injury, and although the cause nearest to the sinking is the leaking, the proximate cause is the injury which set the · cause of leakage in motion without the intervention of any human agency; whereas in the case at bar no injury was received by the flotilla after it broke away from Ninety-Sixth street and before it broke away from Mill Rock, some hours after a human agency, those that made the flotilla fast at Mill Rock, had intervened.

The tying up of the flotilla at Mill Rock was independent of the making fast of the three boats at Ninety-Sixth street, notwithstanding the cause of the boats arriving at Mill Rock, and from then going adrift after the boats had remained tied up for four or more hours at Mill Rock. They did not go adrift because of any act which had been done at Ninety-Sixth street, but solely because of some fault with the lines, their insufficiency, the failure to properly make them fast, or some other unexplained reason, and it seems to me that there is not an unbroken connection between the tying up of the boats left by the Wyomissing at Ninety-Sixth street and the breaking adrift of the flotilla from Mill Rock, when neither the Wyomissing nor the respondent had in any way participated in tying them up.

A decree may be entered in favor of the respondent, dismissing each and all of the libels of this consolidated action, with costs.