MULLER v. GLOBE & RUTGERS FIRE INS. CO. OF CITY OF NEW YORK.

MULLER v. INSURANCE CO. OF STATE OF PENNSYLVANIA.

(Circuit Court of Appeals, Second Circuit.  November 13, 1917.)

Nos. 16, 17.

1. INSURANCE ⬅272, 668(6)—MARINE INSURANCE—DISCLOSURE.
     An applicant for marine insurance is under legal obligation to disclose all facts material to the supposed risk; but the materiality of any fact not disclosed is as much a question of fact as that of nondisclosure or disclosure.

2. INSURANCE ⬅665(2)—MARINE INSURANCE—DISCLOSURE—EVIDENCE.
     In an action on maritime policies protecting the insured against war risk only, based on a binder issued by an agent of the insured, which binder specified no warranties, evidence held to show that the underwriter knew that the applicant for insurance did not want insurance with warranties as to neutrality, because he could not give them, and hence that such applicant was not bound to disclose that his nationality was that of one of the belligerents.

3. INSURANCE ⬅668(10)—JURY QUESTION—PROXIMATE CAUSE.
     Proximate cause of an injury or loss is a question for the jury, unless there is but one inference possible in the settled facts.

4. INSURANCE ⬅402—MARINE INSURANCE—POLICIES—WAR RISK.
     A mere increase of sea peril by removal for belligerent purposes of aids to navigation does not afford ground for recovery under a policy of maritime insurance protecting against war risk only.

5. INSURANCE ⬅413—MARINE INSURANCE—"PROXIMATE CAUSE."
     That cause is proximate which sets other causes in motion, and an intervening act is not a "proximate cause," unless it is efficient to break the causal connection.

     [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Proximate Cause.]

6. INSURANCE ⬅413—MARINE INSURANCE—WAR RISK—POLICY—PROXIMATE CAUSE.
     A shipper of cotton destined to a Swedish port, there to be transshipped to Austria, which country, with Germany, was engaged in war with Great Britain and its allies, secured a maritime policy protecting against war risk only; the insurance covering the risk of capture, seizure, or destruction or damage by men of war, by letters of marque, takings at sea, arrest, restraints, detainments, and acts of kings, princes, and people, authorized by and in prosecution of hostilities between belligerent nations.  The master of the vessel, intending to proceed to a Scottish port and there to submit to examination by British authorities, was boarded by a British cruiser, which sent an armed party on board and directed the steamer to take a particular route to the Scottish port and by night. During the night, aids to navigation having been removed or extinguished, the vessel was wrecked.  The master of the vessel relied on the alleged superior local knowledge of the naval officer in charge of the boarding party.  Held that, as the vessel would not have been boarded, or directed to proceed during the night, but for the war, the loss was the proximate result of acts authorized in prosecution of hostilities, and hence covered by the policy.

7. INSURANCE ⬅132—"BINDER."
     A "binder" is used in marine insurance as an application for insurance made on behalf of the proposed insured and approved by the insurer or his agent.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Libels by Max F. Muller against the Globe & Rutgers Fire Insurance Company of the City of New York and against the Insurance Company of the State of Pennsylvania. From decrees for the libelant, respondents appeal. Affirmed.

Appeals in admiralty from final decrees entered in the District Court for the Southern District of New York. The cases were tried together below, and argued here on one record. Libelant is a subject of the Austro-Hungarian Empire resident in the United States. He sued on. policies of marine insurance issued by the respective respondents, protecting against "war risk" only. The form of words used by both companies was as follows: "This insurance covers only the risk of capture, seizure, or destruction or damage by men of war, by letters of marque, by takings at sea, arrests, restraints, detainments, and acts of kings, princes, and people, authorized by and in prosecution of hostilities between belligerent nations; but excluding claims for delay, deterioration and/or loss of market and warranted not to abandon in case of capture, seizure, or detention until after condemnation of the property insured, nor until sixty days after notice of said condemnation is given to this company. Also warranted not to abandon in case of blockade and free from any claim for loss or expense in consequence thereof or of any attempt to evade blockade; but in event of blockade to be at liberty to proceed to an open port and there end the voyage. Foregoing clause does not cover any war risk on shore."

Neither respondent obtained from Muller (the insured) any warranty against seizure or loss by reason of belligerent ownership. Such warranty is at times inserted in "war risk" insurance, and one form thereof is as follows: "Warranted by the assured that the merchandise covered by this insurance is not owned, consigned or shipped to a German or Austrian subject, and is not intended for consignment to Austria and/or Germany either directly or indirectly."

[7] Both policies in suit resulted from a "binder," issued by one man, who for the purposes of these suits was the agent of both companies. A "binder" is (inter alia) an application for insurance, made on behalf of the proposed insured, and approved by the insurer or his agent. The binder in this instance specifically stated "No warranties"—a phrase admittedly meaning that Muller did not want policies containing such a limitation as above quoted. Accordingly policies issued, in which the above-quoted "war risk" clause covered the whole adventure, and attached to a large quantity of cotton shipped at Galveston on the Danish steamer Canadia, bound to Swedish ports, and cargo consigned to Swedish subjects.

The evidence is clear that the insured cotton was intended for reshipment from Sweden to Austria, and that Muller knew it; his business both before and after the opening of the present war being the purchase of cotton in the United States for the use of certain named Austrian manufacturers. When insurance effected, however, and when the Canadia sailed, no British orders in council had as yet directed seizure of goods such as cotton in neutral bottoms bound to neutral ports, even though shown to be intended for transshipment to a country at war with Great Britain. The steamer's intended course was to the northward of both the Orkneys and Shetlands, and thence to Kirkwall, Scotland, there to submit to examination by British authorities; at least such is the uncontradicted evidence of her master. The usual peace route would have been through the Pentland Firth, a course then deemed dangerous on account of mines, etc.

When within 120 miles of the British coast, the Canadia was boarded by the British cruiser Hilary, which sent an armed party (one officer and six men) aboard, and told the steamer to go to Kirkwall, by the passage between the Orkneys and Shetlands, and by night. The aids to navigation, and particularly the light on the Fair Isle (between the Shetlands and Orkneys), were removed or extinguished, and the Canadia's master objected to the night passage for that reason. He was compelled to attempt it, and a course was

adopted that should have carried clear of Fair Isle by about 12 miles. In doing this the British naval officer and the master of the Canadia consulted, and the latter deposes that he relied on the alleged superior local knowledge of the former. Proceeding by dead reckoning, and taking soundings, both officers seem to have thought the ship clear of Fair Isle, and changed course, but too soon, as the vessel ran ashore on that islet at the foot of a cliff 300 feet high, and became a total loss.

The insurers refused payment, and defended these resulting suits on two grounds: (1) That Muller failed to disclose to them the material fact that he was a subject of Austria-Hungary, a country at war with Great Britain. (2) That the loss incurred was not due to "war risks," but to peril of the sea. Both defenses having been overruled, and decrees entered for libelant, these appeals were taken. Other points were raised in argument, not necessary to mention further.

Frederick R. Coudert and Howard T. Kingsbury, both of New York City, for appellants.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1, 2] It is to be noted that respondents do not complain of concealment in the sense of suggestio falsi, nor allege that there was suppressio veri, in the sense of maintaining silence as to any subject of investigation. The assertion is that Muller failed in the active duty, incumbent upon him as an applicant for insurance, of disclosing every fact material to the proposed contract, which as a matter of business and fair dealing ought to have been disclosed. Such is the legal obligation of the assured, though the materiality of any fact not disclosed is as much a question of fact, as is that of disclosure or nondisclosure. Blackburn v. Vigors, 12 A. C. (1887) 531; Maryland Ins. Co. v. Ruden, 6 Cranch, 338, 3 L. Ed. 242; McLanahan v. Universal Ins. Co., 1 Pet. 170, 7 L. Ed. 98; Royal Ins. Co. v. Martin, 192 U. S. 149, at 163, 24 Sup. Ct. 247, 48 L. Ed. 385.

We will assume (but not decide) that under the circumstances exist·ing Muller's nationality was a material fact. We nevertheless incline to the opinion that disclosure was actually made. Such seems the necessary implication from the brief memorandum filed by the trial judge, and such is the evidence of two witnesses. The sum of their story is that Muller was shipping a great deal of cotton, taking out much "war risk," and other insurance and that the agent who accepted the "binder" application herein had been told repeatedly that Muller was an Austrian. This the agent denies, but we find the balance of evidence against him, largely from consideration of the binder itself. That document as prepared by libelant's broker for presentation to the underwriter, stated in substance that Muller would not warrant his nationality as neutral. That any sensible man, looking at such an application from a Max Muller, could have believed him an American, when insurance with warranty was cheaper, is something of a tax on credulity. We cannot accept appellee's contention that the insertion

in the binder of the phrase "No warranties" relieved Muller as a matter of law from the duty of disclosure: but we do hold, as triers of the facts, that the language quoted is potent evidence to sustain libelant's claim that when the binder was accepted, the underwriter knew that Muller did not want insurance with warranties, because he could not honestly give them.

[3-6] The second contention herein raises ultimately the question of proximate cause, of which, after centuries of litigation, the Squib Case still remains the best and classic example. That the Canadia and her cargo was seized, arrested, and detained within the meaning of the policy we think too plain to require more than mention; the sole query is whether her loss proximately resulted therefrom.

Counsel have, we think, collated all the reported cases whose facts are suggestive;[1] but it should be remembered that, however desirable is the exercise of ordered thought and arrival at a logical result, proximate cause is a question for the jury, unless there is but one inference possible from the settled facts. Therefore decisions of judges are rarely precedents in the same way as are legal rulings. Donegan v. Baltimore, etc., R. R., 165 Fed. 869, 91 C. C. A. 555; Erie R. R. v. Russell, 183 Fed. 722, 106 C. C. A. 160. Of the cases noted below, the Ionides decision best serves as text or starting point. From that ruling it is argued that, if (as was there held) going ashore at a notoriously dangerous point (Hatteras), whose lighthouse had been extinguished as a war measure, was not a "consequence of hostilities," but a sea peril, neither was a stranding on the unlighted Fair Isle proximately caused by any action of "kings, princes, and people," and more especially the British cruiser Hilary.

The contention is not unattractive, and we fully recognize it as a rule of law, supported by reason and the authorities quoted, that a mere increase of sea peril, by removal for belligerent purposes of all or any aids to navigation, does not per se afford ground for recovery under such "war risk" as this, in respect of a loss due to the absence of accustomed assistance. Such act, indeed, no more than restores the dangers of the seas to their normal.[2]

But the problem still remains whether the Canadia's loss was proximately due to sea peril, and solution primarily depends on the meaning of "proximate," as construed by judicial commentators. That cause is proximate which sets the other causes in motion; only when causes are independent is the nearest in time looked to. Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395, a case whose facts are instructive and interesting. If there is an unbroken connection between act and injury, the act causes the injury; an intervening act is not the proxi-

---

[1] Anderson v. Masten, A. C. (1908) 334; Livie v. Janson, 12 East, 648; Green v. Emslie, 1 Peake (N. P.) 278; Hagedorn v. Whitmore, 1 Starkie, 157; Ionides v. Universal, etc., Ass'n, 14 C. B. (N. S.) 259; Magoun v. New England, etc., Co., 1 Story, 157, Fed. Cas. No. 8961; Schieffelin v. New York, etc., Co., 9 Johns. (N. Y.) 21; Patrick v. Commercial Ins. Co., 11 Johns. (N. Y.) 14; Coolidge v. New York, etc., Co., 14 Johns. (N. Y.) 308.

[2] Sed quære, if a belligerent not only removed the civilized aids of peace, but set up false beacons or the like?

mate cause of injury, unless it is efficient to break the causal connection (Milwaukee, etc., R. R. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256).[3]

These rules are guides to ascertaining whether, as matter of fact, the Hilary's seizure of the Canadia caused the loss of the latter, and here both the facts and reasoning of British, etc., Co. v. The King, 33 Times L. R. 520, are illuminating. There a merchant vessel, chartered by the crown as a transport and insured substantially against war risks, was compelled to navigate without lights in the Mediterranean, and while so doing was rammed and sunk by a French man of war. Rowlett, J., held in substance that the obligation, imposed by military necessity, of doing so dangerous a thing as to run at night without lights, made such obligation the proximate cause of collision.

We entertain a similar view in this cause. The Hilary did not say to the Canadia, "Go to Kirkwall, as you intended; the lights are out, and you must pick your own way," but compelled her to pursue an imposed and dangerous route, and especially to go by night in charge of a naval officer whose local knowledge was perhaps deficient, and certainly not useful. Not only did a belligerent's necessity create the peril of unlighted seas, but by "acts of kings, authorized in prosecution of hostilities," the Canadia was forced to run risks that even in time of war she could and would have escaped under the uncontradicted evidence. Furthermore, the very purpose of compelling such navigation was to prevent aid and comfort reaching enemies of Great Britain; therefore the insured cotton was lost in the continuing process of detaining the ship that carried it, for purposes of search, and seizure, too, if the facts found had warranted it.

Thus we find no intervening cause, breaking the causal connection between the control assumed by the Hilary's boarding party, and the loss of the ship. There was no time when the shipmaster was left to navigate his own ship in his own way; she was lost while he was doing what he had to do. A workman compelled to handle familiar tools with one eye blindfolded, and injured by his own blundering use of them, is in truth injured by the person who put compulsion upon him.

For these reasons, the decrees appealed from are affirmed, with costs.

[3] To the same effect are our own decisions in Boston, etc., R. R. v. Miller, 203 Fed. 968, 122 C. C. A. 270; The Anchoria, 83 Fed. 847, 27 C. C. A. 650; Long Island R. R. v. Killen, 67 Fed. 365, 14 C. C. A. 418; The Portia, 64 Fed. 811, 12 C. C. A. 427.