## HAGEMEYER TRADING CO. v. ST. PAUL FIRE & MARINE INS. CO.
## THOMSEN et al. v. SAME.

(Circuit Court of Appeals, Second Circuit. April 14, 1920.)

Nos. 198, 199.

1. **Insurance ⬡⟿416—Marine insurer of cargo of prize cannot defend against loss on ground of negligence of prize crew.**

Where an insurer of cargo against fire, after knowledge that the ship had been captured as a prize of war, renewed the insurance for an additional premium, it cannot defend against a loss by fire on the ground of negligence of the prize crew.

2. **Insurance ⬡⟿413—Fire held proximate cause of loss of cargo, although, after being given up, vessel was sunk.**

Fire originating in the coal bunkers of a prize vessel, which despite all efforts to stop it progressed until in the judgment of the commanding officer the vessel could not be saved, *held* the proximate cause of the loss of cargo, within the terms of an insurance policy, although the ship was then taken into shallow water and sunk.

Appeals from the District Court of the United States for the Southern District of New York.

Separate suits in admiralty by the Hagemeyer Trading Company and by Hugo A. Thomsen and another against the St. Paul Fire & Marine Insurance Company and on separate policies of marine insurance. Decrees for libelants, and respondent appeals. Affirmed.

Certiorari denied 253 U. S. ——, 40 Sup. Ct. 588, 64 L. Ed. ——.

Harrington, Bigham & Englar, of New York City (D. Roger Englar and Oscar R. Houston, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Van Vechten Veeder and Ray Rood Allen, both of New York City, of counsel), for appellees.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The Santa Catharina left New York on July 25, 1914, bound for Rio de Janeiro. She carried cargoes which were insured by the appellant. She was a German steamship. Before reaching her port in South America, the recent war between Great Britain and Germany broke out on August 11th, she was seized as a prize by his majesty's ship Glasgow in latitude 18° 30' and longitude west 38° 24'. The marine risks expressly assumed by the underwriter were against fire. The policies contained the usual clause, excepting loss or expenses arising from capture, seizure, restraint, detention, or destruction, or the consequences thereof; also from all consequences of riots, insurrections, hostilities, or warlike operations. The circumstances concerning the seizure of the vessel and the sub-

---

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sequent burning of the same are set forth in the proof, pursuant to a stipulation, by submitting copies of the affidavits of British naval officers, which affidavits were used in the British prize court on the trial of the claim by a shipper for compensation from the British government on the ground that the loss of its cargo was occasioned by the negligence of the captors.

After being captured, a prize crew was placed on board. She was not taken to any port, but remained anchored at a spot on the South American coast outside of territorial waters and in the near vicinity of a rendezvous of British ships of war and their colliers, store ships, and prizes. The prize crew was composed of men taken from the Glasgow, with a lieutenant of the British navy, a petty officer, an able seaman, and two stokers. The lieutenant's affidavit says that his attention as called to the high temperature of the coal on board, especially in the thwartship bunker, which appeared to have had water poured on it by the German crew. He ventilated the coal by taking off the hatches, closed the apertures below to prevent air passing through the coal, and watered it as much as possible. On September 30, he got up steam in one boiler and pumped water on the coal, and on October 1, Admiral Grant, of the British navy, who had taken charge of the ships at the rendezvous, came aboard and gave directions that the heated coal, which was principally on the starboard side of the bunker, should be removed from that on the port side, which was not heated, and this was done. The lieutenant says it was not possible to jettison the coal, and this, because there was too much coal in the bunker for jettisoning with the crew and appliances which were available. On October 4, the thwartship bunker was flooded to a depth of about two feet, and on the following day it was observed that the coal was completely submerged with water.

On the 10th of October, pursuant to orders of Admiral Grant, the prize crew was taken off and put on the Glasgow, for the reason that the Glasgow had received orders to leave and join the squadron at once at some distant place. On the afternoon of the 10th, the captain of the British admiralty coming from a merchant ship, Orama, which arrived at the rendezvous that afternoon, was given charge of the Santa Catharina and other ships there. He was informed of the condition of the Santa Catharina and told that the prize crew would be taken off; also that there was no imminent danger to the Santa Catharina, and therefore he proceeded with coaling his own vessel. Before leaving the ship, the lieutenant in charge of the prize crew drew the fires of the boiler which was used for pumping. No one was on board that night. The Orama anchored about one mile from the Santa Catharina and continued coaling until the 11th. The weather was bad, a high wind blowing, and there was considerable sea running. At about 1 p. m. on the 11th of October, smoke was seen coming from the Santa Catharina. A captain of the admiralty, with some 16 men, put out in a cutter to her, and they took with them all the fire-extinguishing apparatus which was available. They got on board the Santa Catharina and opened her fiddly door; volumes of smoke

emerged; flames were then seen in the stoke hole. It was found that the coal in the thwartship bunker and the iron work of the alley extending into the bunkers was red hot. The watertight door in the alleyway was closed, leaving only room enough to attach a hose to the seacock in the engine room. Water was poured into the bunkers with buckets, for there were no hand pumps, and the ventilators were plugged. The cutter came alongside and pumped water into the bunkers. This was done with considerable difficulty, because of the heavy sea. The fire spread rapidly, and the captain said it was inevitable that the ship would be destroyed by fire. Fearing that she would attract enemy attention, he decided that the burning ship should be scuttled. He accordingly ordered that she be towed out of the fairway into shallow water and sunk. This was done after many difficulties were overcome. She was sunk that evening outside of territorial waters.

After the capture, and before the fire and final destruction of the vessel, the underwriters entered into an extension agreement, and this for an additional premium of two cents a day. They insured the cargo:

"In case the steamer which the merchandise hereby insured is laden shall put into any port owing to hostilities, or in case the said merchandise is detained at any port or place owing to the same cause, it is agreed without prejudice to the rights under existing insurance, but subject to the terms thereof, that the same shall be held covered at an equitable premium to be charged by this company when particulars are known, afloat or ashore, or by any steamer or steamers until delivered at original point of destination, or in case the goods are not forwarded to destination, until the shipper or consignee can take delivery at the port or place where the original voyage or transit is abandoned, against the same risks only as are covered by the original insurance, and excluding expense of damage due to deterioration, delay, or handling."

A recovery was allowed in each case, because it was held that the proximate cause of the loss of the cargo was the fire, a risk expressly assumed by the underwriters.

[1] The contention here by the appellant is that the proximate cause of the loss was a war peril, excluded from the policy by express provision. It is contended by the appellant that the negligent management or care of the vessel by the British prize crew, and the removal of the crew, was the proximate cause of the loss, and to this is added the other event; that is, the scuttling of the ship to avoid, as Capt. Seagrave said, the attraction of the Germans. But it was known to the appellant that the British had captured the ship, and with full knowledge of this it entered into an extension agreement, assuming the risk while the vessel was in the exclusive charge of the prize crew. The defense of negligence, therefore, because of the management of the ship by the British, is unsound; the risk insured against was fire, and concededly the ship caught fire, and this extended to such a degree that it eventually involved the entire ship, until it appeared to the captain in charge that it was hopeless to save her. Negligence on the part of the captors of the ship is no defense under the circumstances here disclosed, assuming that negligence on the part of

the British crew was proven, or could be fairly inferred from the conduct of the British officers. Certainly mere errors of judgment under these circumstances, fraught with serious dangers, could not be said to be an intervening cause which would relieve the insurance company against its positive engagement against loss by fire. Muller v. Globe Ins., etc., Co., 246 Fed. 759, 159 C. C. A. 61; Singleton v. Insurance Co., 132 N. Y. 303, 30 N. E. 839.

If a cause is approximate in its efficiency, it can be said to be truly proximate. If the efficiency can be said to have been preserved, although other causes may have sprung up, which have not destroyed or impaired the same efficient cause, a result may follow in which that cause still remains the real efficient cause, and to which the event can be ascribed. This court said in Muller v. Globe, etc., Co., supra:

"If there is an unbroken connection between act and injury, the act causes the injury; an intervening act is not the proximate cause of injury, unless it is efficient to break the causal connection."

[2] Under the facts above recited, it is apparent that fire was raging on October 11 and was never extinguished. The origin of the fire was known as coal burning in the bunkers. The fire continued. There was no new or independent cause to break the connection between the fire and the loss. It is true that the captain ordered the ship scuttled and sank her after a deliberate effort, but when this was determined upon it was then hopeless to save the ship, and before this was determined upon every effort, using every appliance at the command of the British seaman, was applied in the effort to save her. There was nothing that intervened which caused the loss, as there was nothing that could intervene at the time that would save the vessel. Comm. Union Assur. Co. v. Pacific Union Club, 169 Fed. 776, 95 C. C. A. 242; Brown v. St. Nicholas Ins. Co., 61 N. Y. 332. The same cause producing the same effect may be proximate or remote as a contract of the parties seems to place it in light or shadow. Bird v. St. Paul F. & M. Ins. Co., 224 N. Y. 47, 120 N. E. 86. That cause is to be held predominant which the parties think of as predominant when making the contract. It was said in Bird v. Insurance Co., supra:

"Fire must reach the thing insured, or come within such proximity to it that damage, direct or indirect, is within the compass of reasonable probability. Then only is it the proximate cause, because then only may we suppose that it was within the contemplation of the contract. In last analysis, therefore, it is something in the minds of men, in the will of the contracting parties, and not merely in the physical bond of union between events, which solves, at least for the jurist, this problem of causation."

This case comes within that category of questions of proximate cause which are considered questions of fact—usually determined by a jury. Here the court below resolved the question of fact, in a court of admiralty, in favor of the libelants. We agree with the conclusion, which the District Judge reached, that the proximate cause of the destruction of the cargo was the fire.

The decrees are affirmed.