# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### THE LLAMA.*

### UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY.

(Circuit Court of Appeals, Third Circuit. July 6, 1923.)

#### No. 2944.

1. **Insurance ☞646(6)—Loss from stranding required vessel to prove cause of stranding was war risk insured against.**

   Where libelant sought to recover on policies insuring against war risks, for the loss of its vessel due to stranding, which was prima facie a marine peril not insured against, the burden is on the libelant to show that the cause of the stranding was one of the war risks insured against.

2. **Insurance ☞665(4)—Latter statement, contrary to sworn statement at time, must be most convincing.**

   A statement by the master as to the cause of the stranding of his vessel, made in support of a libel to recover war risk insurance and showing that the vessel at the time she stranded was being navigated by a foreign naval officer, which was contrary to the statements made by the master to the American consul and to the foreign board which investigated the wreck, and not corroborated by any entry in the log, must be most convincing, both as to its truth and as to the reason for making the prior statements, to entitle libelant to recover.

3. **Insurance ☞665(4)—Evidence held not to shew vessel was navigated by naval officer, so as to make stranding a war risk.**

   On a libel to recover on two policies of war risk insurance for the stranding of a vessel, evidence *held* not to show that the vessel, when she stranded was being navigated by a foreign naval officer, who had boarded her with a prize crew, and therefore not to show that the stranding was a war risk, and not a mere marine peril not covered by the policies.

   Davis, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of New Jersey; Charles F Lynch, Judge.

Libel in admiralty by the Standard Oil Company of New Jersey, as owner of the steamship Llama, against the United States, to recover

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

291 F.—1      *Certiorari granted 44 Sup. Ct. 37, 68 L. Ed. ——.

on two policies of war risk insurance. Decree for libelant, and respondent appeals. Reversed and remanded, with directions to dismiss the libel.

J. Frank Staley, of Washington, D. C., for appellant.

Charles T. Cowenhoven, of New York City (Cletus Keating and John M. Woolsey, both of New York City, of counsel), for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and McKEEHAN, District Judge.

BUFFINGTON, Circuit Judge. In the court below the Standard Oil Company of New Jersey, in pursuance of authorizing legislation, filed a libel against the United States War Risk Insurance Bureau on two policies of war risk insurance on its steamship Llama. On final hearing, that court entered a decree adjudging the insurer liable for the loss of the steamer, and from it the insurer took this appeal.

Inquiring as to the question involved in this case, we note that, as the owners of the Llama assumed all marine risks and as she was lost by stranding, a marine peril, and as such stranding was caused by errors in navigation, also a marine peril, the question involved is whether the insured has shown that the proximate cause of the loss was not these marine perils or errors in navigation and stranding, but was a war peril insured against, namely:

"Takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition or quality soever, and all consequence of hostilities or warlike operations."

The Llama sailed from New York for Copenhagen on October 14, 1915. She was routed "via Kirkwall," pursuant to a prior arrangement made by her owner, the Standard Oil Company, so that her documents could be examined. In pursuance thereof, and as had been done on a previous voyage of the Llama, she was, on October 29, 1915, hailed and stopped by the British cruiser Virginia, and boarded by a lieutenant and four men. After the examination of her papers, which showed the vessel was duly routed "via Kirkwall," the Llama proceeded; the lieutenant and his party remaining on board. He had been directed by the Virginia to see that the Llama keep north of Scule Skerry and North Rona, well-known landmarks, and not to pass between the islands at night.

Subject to these general directions, the captain of the Llama, as would appear from the absence from the log of anything indicating a departure from his previous conduct, laid off, entered all courses, and gave directions; the entries in the log being:

"6:59. Stopped by British cruiser in Lat. 58° 56′ N, Long. 11° 58′ W. 7:30. British naval officer boarded ship with prize crew. 7:31. Eng. aft speed ahead. 7:35. Received order from cruiser to proceed. * * * 8:10. Eng, full speed, ahead. * * * 10:30. Hoisted ship's number to British cruiser."

The log entries contain the usual recital by name of the ship's officers on watch and of the ship's men on the lookout. Other than the above, the log contains no entry or reference to the cruiser, or of the officer and his men aboard the Llama. The entry of the 30th records that on

that night North Rona was reached, viz.: "10:35. North Rona abeam dist. off 9'," where the Llama hove to for the night at the Noup Head. From Noup Head there were two courses to Kirkwall—one called the Fair Island passage; the other, which the Llama took, was called the Westray Firth. The proofs show that the master of the Llama had taken this latter passage on the previous voyage, and that the British officer on board had never taken it. On the next morning, while the Llama proceeded through the Westray Firth, where there was an open leeway of some four miles, she struck a submerged, but charted, reef and stranded. The time was daylight, and the sea conditions, as shown by the log, were "moderate sea, clear," and the entry in the log, "9:07. Struck a reef in Westray Firth."

On November 13, 1915, Clinch the master of the Llama, appeared before the American consul at Dundee, Scotland, and made oath to a marine protest of the loss, wherein his account thereof was given, as follows:

"The said ship proceeded on the said intended voyage as above stated until she reached a point about 400 miles westward of the Orkney Islands, where she was boarded by a British naval prize crew on the morning of October 29th, Noup Head of Westray was made about four miles to northeast about 8 p. m. On the evening of the 30th the master decided to lie off land until daylight; that on Sunday the 31st day of October, 1915, at 8 a. m., the tide at the time being ebb, the weather slightly hazy, and the wind in the southerly direction, blowing gusty and variable, with a heavy swell from the southeast, the said ship entered Westray Firth to make a fairway down the firth. The vessel was holding a course south magnetic, which was considered safe by the master and by the naval officer in charge of the prize crew. The vessel was proceeding at full speed 8 knots, when about half a mile southwest of the Skerries, which lie off Fersness, Westray, the vessel suddenly grounded on a submerged and uncharted rock and remained fast."

In addition to the master, John Caldwell, first assistant engineer, and the carpenter and some seamen, all unnamed, joined under oath in this account of the ship's mishap. On November 2, 1915, the master appeared and made statement under oath, at a hearing had by the deputy receiver of wrecks, held in pursuance of the British Shipping Act of 1894, wherein he stated:

"12. That the said ship proceeded on the said intended voyage as above stated until she reached a point about 600 miles westward of the Orkney Islands, when she was boarded by a British naval prize crew on the morning of October 29th. Noup Head of Westray was made about 4 miles to northeast about 8 p. m. on the evening of the 30th. *Deponent decided to lie off land until daylight.*

"13. That on Sunday the 31st day of October, at 8 a. m., the tide at the time being ebb, the weather slightly hazy, and the wind in the southerly direction blowing gusty and variable, with a heavy swell from the southeast, the said ship entered Westray Firth to make a fairway down the firth. The vessel was holding a course south magnetic, which was considered safe by deponent and by the naval officer of the prize crew. Vessel was proceeding at full speed, eight knots, when about half a mile southwest of the Skerries, which lie off Berskness, Westray, the vessel suddenly grounded on a submerged and uncharted rock and remained fast. The engines were put full speed astern without result.

   *      *      *      *      *      *      *      *      *

"18. That, in deponent's opinion, the cause of the casualty was a submerged and uncharted rock, and it could not have been avoided."

[1] From the above extracts it will appear that the loss of the Llama, as made out by contemporaneous written statements of her log and officers, was due to a marine peril, to wit, "a submerged and uncharted rock," and that when the ship was struck the vessel was holding a course "which was considered safe by the master," and that "it could not have been avoided." The physical fact being that the boat was lost by reason of its stranding, and stranding being prima facie a marine peril, it follows the burden is on the ship's owner to show that the stranding was caused by one of the war risks insured against as heretofore quoted. Monroe v. War Risk Ass'n, 34 Times L. R. 331. This burden the court below was of opinion the insured met, finding in substance that at the time of the stranding the Llama was controlled and navigated by the British lieutenant, who boarded her. After a study of the proofs, we reach a conclusion different from that of the court below, and that in the light of the facts and law the libel should be dismissed.

[2] In reaching that conclusion we start, not only with the prima facies against the Llama arising from her loss by a marine peril, but with a heavy burden of proof arising against her by reason of the fact that no contention, assertion, or even suggestion was made by the captain, when he was called upon to account for the stranding, of any dominating control by the British officer. The silence of the log on that point is highly significant. If control of his ship was taken away from the captain; if its courses were being determined by an alien officer; if its navigation was being directed; if a log is, as its sphere is, to record the history of the voyage—why should it be silent on such an all-important thing as the control and navigation of the ship? Why should it continue to be written just as it had been written before? Indeed, if we gather an account of subsequent events solely from the log entries, we would not know whether the British lieutenant remained on board, for, after the log's entry that he boarded the vessel, there is not only no statement of his remaining aboard, but the subsequent entries, viz.: "Received orders from cruiser to proceed," and "Hoisted ship's number to British cruiser," show that all the directions the captain felt worth while for entry in the log referred to those received from the cruiser, and not from the lieutenant. Seeing, then, that both in the comparative privacy of the log and before any situation arose suggesting the recording of evidence on the subject of alien control of the ship, no entry was made indicating such control, we turn to November 2, 1915, when the next evidential statement was made by the captain. The Llama had been lost, and he then appeared before the British official, empowered by the British government (see section 517 of Merchant Shipping Act, 1894) to investigate the disaster. Here every circumstance, the opportunity of clearing himself from all blame and responsibility for the stranding, the obligation of his oath, impelled the captain to give a truthful account of how and why the stranding took place.

Presumably moved by the two considerations of self-exculpation and truth disclosure, and knowing, as the statement shows he did, that the Llama carried insurance against war risks, but none against marine,

the captain made no statement that he or the vessel was under compulsion, but, on the contrary, states that her course was one which both he and the British officer considered safe, that she grounded on an uncharted rock, and in answer to the inquiry of "the cause of the casualty" he stated that in his opinion "the cause of the casualty was a submerged and uncharted rock, and it could not have been avoided." We have here, then, the deliberate, sworn statement of the captain, exculpating himself on the ground the Llama had struck an uncharted rock while sailing on a course which he approved and which had also the approval of the British officer, a clear case of loss from a marine peril, and with no suggestion of loss from a war peril, and this statement made with knowledge that the vessel had no marine peril insurance, but had war peril insurance. Coupled with the significant absence from the log of any suggestion of control of the Llama by the British officer, the sworn statements made by the captain in this casualty inquiry, alleging the loss was a marine one, and with no suggestion of control by the British officer, we have a case of contemporaneous and evidential statements of such convincing nature as made the case one where a contrary state of facts, later set up, should be, not only of the most convincing character as to their truth, but also explanatory of the silence of the captain when every surrounding circumstance called on him to then make such a statement as he now makes for the libelant.

[3] It is said in his behalf that the captain was averse to making any statement before the British tribunal implicating the British officer, by showing the latter was directing the course of the Llama and was responsible for her stranding. To this an answer would be that, if the captain's statement described the true situation, there was no call to shift the blame from him to the British officer, for that statement placed the blame, not on faulty navigation of either, but on the fact of a submerged and uncharted rock. But the case did not stop with his statement made before an alien official, for on November 13th the captain, with an officer and members of the crew, appeared before the American consul at Dundee, and again under oath entered a marine extended protest, wherein he made no assertion that the ship was under the control of the British officer, but after stating as he had done in the wreck inquiry, that on the night before "the master decided to lie off the land until daylight," the Llama proceeded the next morning on her course, and that when she stranded "the vessel was holding a course south magnetic, which was considered safe by the master and by the naval officer in charge of the prize crew," he alleged she "suddenly grounded on a submerged and uncharted rock."

If these several statements be accepted as a true and full account of the stranding, we have here a loss from a marine peril and resulting from following a course in which both the captain and the British officer concurred. They suggest no dominating control, no superseding of the captain by the British officer, but, on the contrary, the selection of the course by the captain and the justification of that selection by the concurrence of the British officer, and, so regarded, we have the case of a peril and a loss due, not to a war risk, but to a marine peril, for the concurrence of the two men in the course was not something

done by stress of war, but at most by the concurrent mistake of two men who were attempting to safely navigate a ship through an open fairway, but who mistakenly stranded her on a submerged, unknown reef. Taken at its most, the captain thought he was right, the British officer thought the captain was right, but in point of fact both were wrong. There was nothing partaking of war in the ship going on a submerged, uncharted rock, owing to the miscalculation of those directing her course, and therefore the cause of the loss, viz. the stranding, the marine character of the peril, is not affected by the one directing the course, whether his or their uniforms were those of a mariner or a naval officer. The stranding was the dominant causal factor of the loss, and that stranding, if the contemporaneous evidence as to the loss be accepted, resulted from the conjoint, but mistaken, navigation of the captain and the British officer.

Accepting, then, these contemporaneous statements by the captain of the circumstances as correct, his testimony, given nearly six years after, to the effect that the navigation of the ship was taken out of his hands by the British naval officer, and the course over the submerged reef was one selected by the latter and the ship constrained to follow it without his (the captain's) concurrence, is not convincing. There is no explanation by the master of his change of position, or as to why he did not enter in the log, or in the wreck inquiry or consular protest assert, or even suggest, what he now contends, namely, that the British officer was navigating the Llama and stranded her on the reef. Standing alone, these circumstances are such as to cause us to question his later testimony; but when to this is added the fact that the captain had taken the Llama through the Westray Firth before, but the British officer had never been through it, that the captain admits that, when the officer came aboard, he made no statement that he himself was to navigate the vessel, or gave any instructions to his own men that they were to do so, the captain's self-contradiction on the stand in testifying first that he had not been court-martialed, and later admitting that he had been court-martialed for drunkenness, and in further view of the testimony of the British officer that he did not oust the captain's control over the navigation of the ship, we are clear that the libelant has not met the burden resting upon it of showing that the causa causans of the loss was a war risk and not a marine one.

We may refer to other proofs in the case supporting both sides, all of which have had our attention; the testimony of Jansen, the third officer of the Llama, in support of the captain's later version; the absence or failure to account for the loss of the chart books in which there might have appeared or been wanting the figuring of courses in confirmation or contradiction of the captain's testimony that the British officer did the charting; and of the fact that while Caldwell, the first assistant engineer, the carpenter, and some seamen, were present and were sworn before the consular inquiry, and joined in the account of the loss as then stated by the captain—none of them were called or their absence accounted for in the present proceeding.

The view we have taken of the situation, namely, that the libelant has not satisfied us that the Llama was being navigated by the British

officer when she stranded, renders it needless to refer to the many authorities cited, all of which have had our careful examination.

The cause will therefore be remanded to the court below, with directions to vacate its decree and dismiss the libel; the libelant bearing the costs in this court and in the court below.

DAVIS, Circuit Judge (dissenting). I am unable to subscribe to the conclusions of my colleagues in the foregoing opinion. The tanker Llama sailed from New York for Copenhagen, Denmark, October 24, 1915. She was, according to her chart, to stop at Kirkwall, Scotland, as required by the British government. When about 400 miles westward of the Orkney Islands, on October 29, 1915, she was hailed by the British cruiser Virginia, and was boarded by a British prize crew or armed guard of five persons under the command of Naval Officer Lieut. Cox. From that point the Llama proceeded toward Kirkwall, through Westray Firth, and when in the vicinity of Skea Skerries on October 31st, she struck a submerged rock and became a total loss.

The question of first importance, because the determination of this case depends upon it, is under whose direction or authority the navigation of the Llama proceeded from the time she was boarded by the prize crew. The learned trial judge found as a fact that she was navigated under the direction of Lieut. Cox, who selected the route through Westray Firth and directed her courses. If this is a fact, the law is clear that the United States, operating through tthe Bureau of War Risk Insurance, which insured the vessel against "takings at sea, arrests, restraints and detainments of all kings, princes, and peoples, of what nation, condition, or quality soever, and all consequences of hostilities or warlike operations, whether before or after declarations of war," is liable for the loss, and the taking or restraint, under the authorities, was the proximate cause of the accident and consequent loss. Magoun v. New England Marine Insurance Co., Fed. Cas. No. 8,961; Muller v. Globe & Rutgers Fire Ins. Co., 246 Fed. 759, 159 C. C. A. 61. If this be not the fact, and the prize crew under Lieut. Cox in no way interfered with the control of the ship or the selection of the route and courses, it is likewise clear that the United States is not liable for the loss.

This court has concluded that the learned District Judge erred in finding the above facts. It has found that as a matter of fact the British lieutenant did not interfere with the control of the vessel, nor determine her route nor courses to Kirkwall, but that these were determined wholly by the captain of the vessel. This conclusion is based on the testimony of Lieut. Cox and the silence of the captain as to the control of the vessel in the log, the consular protest, and the wreck inquiry. Lieut. Cox testified that he had nothing to do with the management of the vessel or the selection of her route or courses. The control of the vessel and the selection of the route and courses were subjects that did not properly or necessarily arise in the log, the protest, or wreck inquiry. It was admitted that Lieut. Cox did direct the first course of the Llama after he boarded her, but no mention is made of that fact. It is therefore not strange that no mention is

made of the route and other courses. The settlement in the log, protest, and wreck inquiry of the questions of the control of the vessel and the determination of the route and courses would throw no light on the physical cause of the accident.

Printed forms are used indicating in the margin the information desired and there is nothing in those forms properly calling for the settlement of this question, or the discussion of this controversy therein. At most, the conclusion of the court that the assumption of control by Lieut. Cox, if a fact, would necessarily appear in the log, protest, and wreck inquiry, is an unnecessary inference from silence under circumstances rendering it uncertain as to whether or not the captain should then and there have spoken. The protest and inquiry do, however, contain this statement, which indirectly throws light on the question:

"The vessel was holding a course south magnetic which was considered safe by the master and by the naval officer in charge of the prize crew."

This, at least, shows joint control, and is very significant, when taken in connection with the purpose of boarding the vessel by the armed guard, the statement of Lieut. Cox that he had power and authority to correct anything suggested by the captain which did not meet his approval, that he had four armed men to assist him, and that nothing was done in navigating the vessel of which he or his assistants did not know and to which they did not assent.

Further, there are two routes to Kirkwall; one through the Fair Island Channel, and the other through the Westray Firth. Who selected the route through Westray Firth? This court in its opinion said:

"The proofs show that the master of the Llama had taken this latter passage on the previous voyage and that the British officer on board had never taken it."

This is not the whole story. The undisputed proofs show that the master, who had made many trips, was taken to Kirkwall on the previous trip by a British prize crew or armed guard through the Westray Firth, which was the usual route traveled by British prize crews; that on every trip before that the captain had gone through Fair Island Channel, and on this very trip the Llama was routed through the Fair Island Channel. After the naval officer had boarded the vessel and examined the papers, he said:

"I then went on the bridge and signaled my investigation to the cruiser [Virginia], who gave me orders to proceed with the ship to Kirkwall."

He further said:

"I told him [the captain] that the orders had come through as to the course to steer."

The route through Westray Firth was about 50 miles shorter than the route through Fair Island Channel, and besides it was reported that there were submarines in Fair Island Channel, but none in Westray Firth. Lieut. Cox further testified that it was his duty to take the Llama to Kirkwall "by the safest route" and "with all dispatch."

The instructions of the British Admiralty to officers in charge of armed guards upon boarding vessels contained the following:

"The master should be given the special route to be followed."

The captain and Christian P. Jensen, third mate of the Llama, unequivocally testified that the naval officer directed the vessel through Westray Firth and determined the courses, but that the vessel had been routed through the Fair Island Channel. The learned District Judge said:

"This conclusion [the assumption of control and determination of the route by Lieut. Cox] is arrived at, not only because the weight of the evidence seems to justify it, but also because the version of the master and third officer of the Llama seems to me to be more probable. The war between Great Britain and Germany was then in progress, and German submarines were plying the open sea beyond the Fair Island Channel. Although this was a neutral vessel, carrying a noncontraband cargo to a neutral port, those in control of a German submarine would undoubtedly have evinced considerable interest upon discovering a neutral vessel loaded with oil in the control of a British armed crew, and it seems highly improbable that the possibilities of this submarine peril were overlooked by the young lieutenant at the time the intended course into Kirkwall was discussed by him with the master."

So far as inferences are to be drawn from facts and indirect testimony, they are in perfect harmony with the facts found below. The conclusions really depend upon the veracity of Lieut. Cox on the one side and the captain and Jensen on the other. When Jensen testified, he was the chief officer of the Agememnon, in the employ of the United States, and if he had any bias whatever it would have been in favor of the respondent. Therefore his testimony is entitled to great weight, and should not be set aside by inferences drawn from silence. There is no question about the fact that Lieut. Cox was the absolute master of the vessel. He admits it, and everybody on the vessel knew it. He testified that he did not exercise his mastery over the vessel; but it seems to me that, notwithstanding his denials, his own statements, taken in connection with the positive testimony of others, together with the circumstances, unmistakably show that he did, and that the conclusions of the learned District Judge were in accordance with the truth, and should be affirmed.